## William Mitchell and another v. Gustavus V. Hosmer.

*Towing logs: Delivery: Negligence: Charge to the jury.* In an action to recover the price of towing under an agreement to tow logs and deliver them at a named mill, where the defense is set up that through the negligence of the plaintiffs in fastening a raft outside the mill boom, instead of delivering the same safely within the mill boom, a storm which arose broke up the raft and carried away some of the logs, a charge to the jury that if, when the plaintiffs arrived with the tug and raft, the boom was not in a condition to be entered, and it was apparent that in five or six hours, or some other reasonable time, an entrance would be practicable, it was their duty to remain there for such time, unless, on consultation with those in charge of the boom, their earlier departure was assented to, is held under the circumstances of this case to be erroneous, in that it attributed to the plaintiffs a distinct, separate, and imperative duty, and wholly ignores the existence of any concurrent duty of the defendant or those who were to receive for him.

*Negligence: Charge to the jury.* The fact that in connection with such charge it was suggested by the court that the tug, by waiting, would have been entitled to advance a claim in the nature of demurrage, whether such suggestion be correct or not, could have no effect to cure the error committed in giving the charge, since if the supposed duty to wait rested with imperative force on the plaintiffs, then their violation of that duty rendered them liable, irrespective of the question whether they would or would not, by remaining, have founded a claim in the nature of demurrage.

*Towing logs: Delivery: Contract construed: Diligence: Concurrent duties of the parties.* The very nature of the contract between the parties presupposed at least that due diligence would be exerted to assure and afford accommodations and facilities for depositing the logs inside the boom within a reasonable time, and without unreasonable risks, and imposed the duty on the defendant of furnishing, so far as the weather would fairly permit, such instruments and agencies at the boom, and providing for their use there with such reasonable skill, care, and diligence as would enable the plaintiffs, with equal skill, care, and diligence, to do their part in bringing about the delivery agreed upon.

*Towing logs: Delivery: Diligence.* In the absence of any specific stipulations in the agreement as to the exact course to be taken by the respective parties on the arrival of the raft, or of any showing of usage on the subject, the transaction was necessarily to be explained by attributing to each party just that kind and range of duties rendered appropriate and reasonable by the positions of the parties, the nature of the business, and the special facts.

*Submitted on briefs July 22. Decided October 7.*

Error to Bay Circuit.

*Marston, Hatch & Cooley*, for plaintiffs in error.

*Holmes, Haynes & Stoddard*, for defendant in error.

GRAVES, CH. J.

This was an action of assumpsit brought by the plaintiffs in the court below to recover a balance they claimed for towing certain rafts for defendant. The defendant insisted that what he had already paid was fully sufficient to satisfy for the true quantity of logs which had been towed and delivered. He also set up a claim by way of recoupment, and which he founded upon the alleged default and misconduct of the plaintiffs in performing their duty in regard to the towage and delivery. The plaintiffs recovered sixty-eight dollars and seventy-three cents; and, being dissatisfied with this finding, they have brought the case here for review upon writ of error and bill of exceptions. Before noticing any of the legal questions, it is best, perhaps, to advert to several of the facts. In the season of 1869 the plaintiffs were engaged in towing with steam tugs on Saginaw Bay and Lake Huron; and the parties hereto entered into an agreement that during the fall of that year the plaintiffs should tow for the defendant a quantity of logs from Rifle River, in Saginaw Bay, to Tawas, at fifty cents per thousand, and return the boom sticks free. Pursuant to this arrangement, some six rafts were towed, on which the defendant paid six hundred and thirty dollars. The plaintiffs claimed that they were entitled to the further sum of one hundred and twenty-five dollars and fifty-seven cents, with interest from October 10, 1869.

The main question is connected with what took place concerning the fifth raft. According to the proof on both sides, this raft was to be delivered at Adams' mill at Tawas, and the evidence conduces to show that the plaintiffs' tug, under the command of one of the plaintiffs, Mr. Mitchell, arrived with the raft between midnight and daylight on the morning of Saturday, the 15th of October,

near the entry of the boom connected with Adams' mill; that within a pretty short time the persons. in charge of the tug tied the raft to Adams' dock and to an adjacent one belonging to Mr. Grant; that the weather was then good, and Captain Mitchell, as soon as the raft was thus tied outside the boom, left it and returned with the tug to Au Sable for another raft; that early in the morning Mr. B. M. Hosmer, the defendant's agent, discovered the raft tied outside of the mill boom, and, feeling uneasy as to its safety, immediately tried to get help to place it inside; that before this could be accomplished the wind and sea arose, and became so violent that before he could swing the rear end around Grant's boom, in order to effect an entrance into that of Adams', some of the cribs went ashore and part of them astray, and some forty-two logs escaped into the open bay and were lost; that most of the logs which were cast upon the shore were separated from their cribs, and had to be re-rafted by defendant; that the plaintiffs did not return with the tug until the 16th or 17th, the evidence differing as to the day.   The testimony was somewhat conflicting as to the state of fitness of Adams' boom for admitting the raft when the tug arrived there, and also as to the facilities afforded for booming, and as to what occurred between the person in charge of the boom and Mr. Mitchell, as master of the tug, and his servants.   Captain Mitchell testified that when he came abreast of the boom entrance, he saw the man who usually attended to it;   that this person did not tell him to put the raft into the boom, or say that he would open it, or give any directions about putting the logs within it;   that he, Mitchell, was employed about an hour and a half in tying the raft, and during that interval saw no other person there.   At a subsequent stage of the trial, and after the defendant had introduced his defense and rested, the plaintiffs gave evidence tending to show further that when the tug arrived opposite the boom door or entrance, there was a large quantity of logs inside;   that the boom was nearly two-thirds full, and that the logs

were pressed by the wind against the gateway; that the man in charge informed the managers of the tug that he could do nothing; that he could not move the logs which were against the opening, and could not prepare the gap or way so as to let the tug and raft enter.

On the part of the defense the testimony went to show that the person then having charge of the boom for Mr. Adams was one Jackson; that he was on duty near the gateway of the boom when the raft appeared, and attending to receive it; that it was not hauled up as far as the gap; that he cried out to those on the tug to "come ahead," and that, as near as he could understand what was said, they claimed either that they could not get in or were in a hurry; that the boom was in good condition, with the exception that the gap was incumbered by a few thirty-foot sticks, which the wind held there; that an entrance was practicable with little trouble, and that not more than ten or fifteen minutes would have been required to effect it; that there was plenty of room inside, and when he observed that the persons with the tug were fastening the raft outside, he at once proceeded to inform Mr. Adams, and was gone not to exceed twenty minutes; but when he returned the tug had sailed away.

This reference to the circumstances, and to the drift of the evidence, is all that is necessary for the disposition of of the point we are now considering.

The defendant maintains, and the court charged in substance and effect, that if, when the plaintiffs arrived with the tug and raft the boom was not in a condition to be entered, and it was apparent that in five or six hours, or some other reasonable time, an entrance would be practicable, it was their duty to remain there for such time, unless on consultation with those in charge of the boom, their earlier departure was assented to. The whole language of this part of the charge is not repeated, but its sense and import, as it must have been understood by the jury, are given. It is true, that, in the same connection,

it was suggested by the court that the tug, by waiting, would have been entitled to advance a claim in the nature of demurrage. But this remark is not considered, under the circumstances, as meriting any special comment. If the supposed duty to wait, in the actual state of things, rested with imperative force on the plaintiffs, then their violation of that duty, by going away immediately without consent, afforded ground of legal complaint against them by the defendant, irrespective of the question whether they would or would not, by remaining, have founded a claim in the nature of demurrage.

We have no occasion, therefore, to admit or deny the soundness of this intimation.

In view of the evidence relating to the condition of the boom when the raft arrived there, the proceedings which then occurred, and the immediate departure of the tug, it is very apparent that this instruction as to the duty of the plaintiffs to stay was eminently important. The facts were open to a construction by the jury which would subject them to the application of the rule stated by the court, and in such an event it could not operate otherwise than in a manner very decisive against the plaintiffs.

Was the law correctly laid down? Were the plaintiffs under the separate and positive duty explained by the court? If they were, then, independently of any endeavors or co-operating conduct on the side of the defendant, either by himself or those in charge of the establishment to which he had consigned the raft, the plaintiffs were absolutely bound, if the boom was not in condition to admit the logs, to wait there with the tug a reasonable time for it to get in some way in proper condition. No duty or diligence on the other side, in having the boom ready, or in making it ready, or in operating it to facilitate the booming, was alluded to. The charge attributed to the plaintiffs a distinct, separate and imperative duty as a consequence of the actual conditions, however caused, and wholly ignored the

existence of any duty of the defendant or those who were to receive for him at the boom.

The parties do not seem to have expressly stipulated in regard to the time to be allowed for the tug to enter and discharge her tow, or as to the specific things which each side should do to effectuate the expected entrance and discharge; still the defendant consigned the logs to Adams' mill-boom, and he virtually engaged that somebody should there manage so as to enable the delivery to be made within the boom in such reasonable time and manner, in view of the weather as it might then be, as not unreasonably to prejudice or delay the plaintiffs in the use and enjoyment of their tug.

The very nature of the contract between the parties presupposed, at least, that due diligence would be exerted to assure and afford accommodations and facilities for depositing the logs inside within a reasonable time and without unreasonable risks, and it was a duty assumed by the defendant that, in so far as the state of the weather and its influence would fairly admit, such instruments and agencies should be furnished at the boom, and there used with such reasonable skill, care and diligence as would enable the plaintiffs, with equal skill, care and diligence, to do their part in bringing about the delivery agreed on. The plaintiffs did not expressly or by implication agree to work out a delivery without any assisting agency or act on the other side at the booming place; nor did they stipulate or bind themselves in any form or manner that, in case the entering of the logs should be hindered, obstructed or delayed on account of the want of reasonable skill, care and diligence on the part of the defendant or his depositaries, the tug should be compelled to tarry at the boom to await events. In short, the parties having failed to stipulate expressly as to the exact course to be taken on arrival, and no usage on the subject having been proved, the transaction was necessarily to be explained by attributing to each party just that kind and range of duties suggested as appro-

priate and reasonable by the positions of the parties, the nature of the business, and the special facts. Hence, it was needful to consider that each side was to be an actor in bringing about the final deposit within the boom, and that each side was bound to use reasonable skill, care and diligence to accomplish the particular duties resting on it, to consummate the deposit. Precisely what were the acts and things which rightly fell to the one side and to the other cannot be enumerated or marked out on this record. When the relative situations of the parties and the proper explanatory facts and special incidents are shown to the jury, they will probably experience but little difficulty in ascertaining what was fairly and regularly required on each side. The plaintiffs were not bound to be more than reasonably skillful, careful and diligent on their part, and were not required to assume duties belonging to the other side; and if the other side was not reasonably skillful, careful and diligent, and delay was thereby caused, or risks consequently incurred, the plaintiffs were not responsible therefor, or subject to be charged on that account with any legal duty to stand by for the purpose of averting the consequences. The charge, then, was not accurate, inasmuch as it failed to recognize that there were concurrent duties connected with the booming of the logs, and overlooked the circumstance that the plaintiffs could not be required to keep their tug waiting if the delay was exclusively owing to the want of reasonable skill, care and diligence on the part of the defendant or his depositories.

For this error, I think the judgment should be reversed with costs, and a new trial ordered.

The other questions raised by the record are unimportant, and may probably not come up again.

The other Justices concurred.